**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **DUANE L. LOYD,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA and NAPHCARE INC.,**<br><br>**Defendants.** | **Case No.: EDCV 23-00381-CJC (SSCx)**<br><br>**ORDER DENYING NAPHCARE'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT [Dkt. 80]** |

## I. INTRODUCTION

In this case, *pro se* Plaintiff Duane L. Loyd alleges that he did not receive proper or timely medical care while he was in prison, which led to a bone infection, significant pain, and the amputation (across two separate procedures) of his left great toe. (*See generally* Dkt. 61 [First Amended Complaint, hereinafter "FAC"].) His original Complaint, filed in January 2023, named only the United States of America as a defendant. (Dkt. 1.) His First Amended Complaint, filed in December 2023, added as a

defendant NaphCare, Inc. ("NaphCare"), a third-party contractor that facilitates outside medical care for inmates. (Dkt. 61.) Against NaphCare, Plaintiff asserts claims for "ordinary negligence," "reckless / willful misconduct," and intentional infliction of emotional distress ("IIED"). (*Id.* at 10–11.)

Before the Court is NaphCare's motion to dismiss Plaintiff's claims against it. (Dkt. 80.) The Court has now received Plaintiff's opposition and NaphCare's reply. (Dkts. 88, 97.) For the following reasons, NaphCare's motion is **DENIED**.

## II. BACKGROUND

Plaintiff is a lifelong insulin-dependent diabetic with diabetic neuropathy. (FAC ¶ 21.) At all relevant times, including the present, he has been in custody of the Bureau of Prisons ("BOP"). In October 2019, BOP determined that Plaintiff had "uncontrolled diabetes" and was designated a "Chronic Care" patient. (*Id.* ¶ 7.) Beginning in February 2020, Plaintiff began to experience pain and discomfort in his left great toe. (*Id.* ¶ 22.) Plaintiff notified prison health services that he was diabetic and concerned with the pain in his toe and requested to be seen by medical personnel for his emerging toe issue. (*Id.*) Plaintiff's concern was well-founded given that the intersection of foot injuries and diabetes presents significant danger and risk for complications, including the need for amputation. (*Id.* ¶¶ 9–20.) Nevertheless, health services never responded to Plaintiff. (*Id.* ¶ 22.) As Plaintiff's pain worsened, he continued to submit additional requests to be seen. (*Id.* ¶ 23.)

Finally, two months after his initial complaint, Dr. Michael Mank examined Plaintiff on March 24, 2020. (*Id.* ¶ 24.) Dr. Mank diagnosed Plaintiff with a fungal infection of his left great toe and offered Plaintiff cream for athlete's foot. (*Id.*) According to Plaintiff, Dr. Mank did not do any of the required testing pursuant to

various healthcare standards implicated by Plaintiff's diabetes. (*Id.*) Doctor Mank did not follow up with Plaintiff, and Plaintiff submitted several additional sick-call requests for pain and gait impairment. (*Id.* ¶¶ 25–26.)

Two months later, Plaintiff presented himself to health services and informed RN Julie Filamore-Angel that his toe was swollen, had discharge, and was painful. (*Id.* ¶ 27.) RN Filamore-Angel noted that he had a wound on his left great toe about the size of a nickel. (*Id.*) Instead of testing the wound for infection "the RN simply gave him a band-aid." (*Id.* ¶¶ 28–29.) She informed him that his issue would be addressed with his assigned medical provider, but no follow up occurred. (*Id.* ¶ 27.)

After submitting even more sick-call requests "complaining of pain and limitation of daily living tasks," Physician's Assistant Jose Esquietini examined Plaintiff on June 11, 2020. (*Id.* ¶ 30.) "Esquetini observed an ulcer that was bloody, black, and copiously discharging pus on [Plaintiff's] left toe." (*Id.*) Without taking a culture to determine the appropriate treatment, Esquietini prescribed Plaintiff two weeks of antibiotics. (*Id.*)

Plaintiff continued to submit sick-call requests complaining of pain and infection, but he was not seen by medical personnel until September 18, 2020. (*Id.* ¶ 32.) On that day, he informed Nurse Fraboni that he was a diabetic and his "toenail fell off and it's getting worse." (*Id.*) Nurse Fraboni advised Plaintiff to buy fungal cream from the commissary and to buy Vick's Vapor Rub to apply to his toe for pain. (*Id.*) On November 18, 2020, Plaintiff emailed the prison's associate warden informing him of the situation and his lack of adequate medical care. (*Id.* ¶ 34.) The warden responded that he had passed Plaintiff's email on to health services. (*Id.* ¶ 35.) It would be three more months before Plaintiff received a substantive medical examination. (*Id.*)

On February 26, 2021, Plaintiff was seen for a diabetic exam with Dr. John Nguyen. (*Id.* ¶ 36.) Plaintiff explained that his left toe had been infected for months. (*Id.*) Dr. Nguyen cleaned Plaintiff's wound and, again without taking a wound culture, prescribed antibiotics. (*Id.*) Dr. Nguyen scheduled a follow-up exam for one week later, but it never occurred. (*Id.* ¶ 37.)

Two more months passed without medical care, during which Plaintiff continued, in vain, to submit sick-call requests complaining of pain and infection. (*Id.* ¶ 38.) On April 20, 2021, Plaintiff went to health services without any appointment and "demanded to be treated," but Dr. Mank "refused" to see Plaintiff. (*Id.*) Plaintiff then went to the prison lieutenant and "refused to return to his housing without proper medical care." (*Id.* ¶ 39.) After the lieutenant saw Plaintiff's "gory oozing wound," the lieutenant ordered another prison officer to take Plaintiff to health services and "direct[ed] medical staff to immediately treat him." (*Id.* ¶ 39.)

Dr. Mank finally conducted an x-ray of Plaintiff's toe. (*Id.* ¶ 40.) Dr. Mank noted that the x-ray showed Plaintiff had a serious bone infection on his left great toe. (*Id.* ¶ 42.) 13 months had passed since Dr. Mank initially diagnosed Plaintiff with an infection of his left great toe. (*Id.* ¶ 41.) Dr. Mank ordered Plaintiff be taken to an outside hospital for treatment. (*Id.* ¶ 43.)

After several days of unsuccessful attempts by hospital specialists to control Plaintiff's bone infection, the resident podiatrist decided amputation was necessary because of a "non-healing ulceration and necrotic bone." (*Id.* ¶ 45.) "Due to the massive infection that had invaded [Plaintiff's] bone, the top of his toe was amputated." (*Id.*) Plaintiff "spent weeks in the hospital on a rigid regimen of antibiotics." (*Id.* ¶ 46.)

When Plaintiff was discharged, the hospital discharge directives "included an order for an MRI to check 'for clearance of infection;' an order to 'continue non-weight bearing for one week, and continue with physical therapy.'" (*Id.* ¶ 47.) Thereafter, on May 14, 2021, Dr. Mank submitted a request to NaphCare to schedule physical therapy "to adjust to walking post amputation" with a target date of June 1, 2021. (*Id.* ¶ 48.) According to Plaintiff, NaphCare is a third-party medical appointments scheduling company that is contracted by BOP. (*Id.* ¶ 4; *see also id.* ¶ 73 ["Naphcare . . . is in the business of scheduling health care for incarcerated persons."]) Despite Dr. Mank's request, Naphcare never scheduled the prescribed physical therapy. (*Id.* ¶ 48.) On May 20, 2021, Dr. Mank noted that the hospital recommended an MRI to monitor Plaintiff's recovery, so Dr. Mank submitted a request for an MRI with a target date of June 19, 2021. (*Id.* ¶ 49.) NaphCare again failed to schedule the prescribed appointment. (*Id.*)

During this time, Plaintiff was kept in a non-sterile environment. (*Id.* ¶ 50.) He was given gauze and told to change his own wound dressings, but he was not even given enough new gauze such that he had to wash his used wound dressings so that he could reuse them. (*Id.*) Nor was he given any walking device to help him stay off his foot. (*Id.*) He was also in significant pain but not given any pain medication. (*Id.*) Plaintiff sent prison staff multiple requests for help, explaining his pain and the lack of follow-up care—all to no avail. (*Id.* ¶¶ 50–51.) Finally, on June 21, 2021, Dr. Mank noted that Plaintiff was still awaiting an MRI. (*Id.* ¶ 52.) That day, he requested an appointment from NaphCare for Plaintiff to see an outside podiatrist. (*Id.*) That appointment did not occur until April 2023. (*Id.*)

Due to his complaining, Plaintiff was eventually taken back to the prison's health services, where Dr. Mank ordered an x-ray which showed further infection in Plaintiff's toe. (*Id.* ¶ 54.) He was again taken to an outside hospital, at which time doctors amputated his entire left great toe because of his bone infection. (*Id.*) He was kept at the

hospital for six weeks to undergo massive antibiotic infusion. (*Id.* ¶ 55.) Upon his return to prison, he was again kept in an unsterile environment without adequate wound care, forced to bear weight on his injured foot, and deprived of pain medication. (*Id.*) As a result of this ordeal, Plaintiff "has been crippled and is forced to endure life-long misery of disability and pain." (*Id.* ¶ 58.)

Plaintiff "exhausted all available administrative remedies" for his claims. (*Id.* ¶ 5.) On January 17, 2023, he filed his Complaint against the United States of America, asserting negligence under the Federal Tort Claims Act ("FTCA"). (Dkt. 1.) On December 21, 2023, with leave of the Court, Plaintiff filed his First Amended Complaint, based substantially on the same factual allegations but adding NaphCare as a defendant. (*See* FAC; Dkt. 62 [granting Plaintiff's motion for leave to file amended complaint].)

NaphCare filed a motion to dismiss on March 12, 2024. (Dkt. 80.) The Court previously granted NaphCare's motion, citing Plaintiff's failure to file a timely opposition. (Dkt. 82.) However, the Court vacated that order when it received Plaintiff's request for an extension of time to file an opposition.[1] (Dkt. 86.) Plaintiff filed his opposition, and NaphCare filed its reply in support of its motion to dismiss. (Dkts. 92, 97.)

## III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may seek dismissal of a complaint for lack of subject matter jurisdiction. Challenges under Rule

---

[1] Plaintiff explained that because he is currently incarcerated in New York, there is a significant lag time between when pleadings are filed and when he receives them. (Dkt. 85; Dkt. 88 ["There is an approximate 7–10 day delay between all mailings sent and received between myself and the Court and the litigants based in California. . . . Sometimes, the filings have sat in the prison mail room for an additional few days before being delivered to me."].) Similarly, he does not have access to the ECF filing system, so there is a similar lag when he files his pleadings. (*Id.*)

12(b)(1) "may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a "facial attack, the challenger asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a plaintiff's claims. The issue on a motion to dismiss for failure to state a claim is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012). To survive a motion to dismiss, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## IV. DISCUSSION

NaphCare argues that the Court lacks subject matter jurisdiction over Plaintiff's claims against it, that Plaintiff's negligence claim against it is time barred, and that his

First Amended Complaint fails to state sufficient facts to support his claims against it. (Dkt. 80 at 8–19.) All NaphCare's arguments fail.

**A. Jurisdiction**

NaphCare argues that because "the United States is the only proper defendant in an action brought under the FTCA" "the FTCA claim does not create an independent basis for subject matter jurisdiction with respect to Plaintiff's claims against NaphCare. Nor can Plaintiff assert any FTCA claim against NaphCare." (Dkt. 80 at 11.) While it is true that Plaintiff cannot assert an FTCA claim against NaphCare, Plaintiff does not attempt to do so. Rather, he asserts an FTCA claim against the United States and asserts common law claims against NaphCare arising from a "common nucleus of operative fact." *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1173 (9th Cir. 2002). The Court undoubtedly has jurisdiction over Plaintiff's FTCA claim brought against the United States and may exercise supplemental jurisdiction over his claims against NaphCare. *See Agyeman v. Corr. Corp. of Am.*, 390 F.3d 1101, 1103–04 (9th Cir. 2004) ("Agyeman would have had the option of bringing this suit against Corrections Corporation by joining the latter as a defendant in the suit under the Federal Tort Claims Act and requesting the district court to exercise supplemental jurisdiction over this defendant."); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 565 (2005) ("The argument that the presence of additional parties removes the civil action from the scope of § 1367(a) also would mean that § 1367 left the *Finley* result undisturbed. *Finley*, after all, involved a Federal Tort Claims Act suit against a federal defendant and state-law claims against additional defendants not otherwise subject to federal jurisdiction. Yet all concede that one purpose of § 1367 was to change the result reached in *Finley*."). Indeed, NaphCare appears to have abandoned this argument in its reply in support of its motion to dismiss. (*See* Dkt. 97 [failing to mention jurisdiction].)

**B. Statute of Limitations**

NaphCare also argues that Plaintiff's negligence claim against it is time barred. (*Id.*) The Court disagrees.

NaphCare asserts that is a "health care provider" as defined under California law and characterizes Plaintiff's negligence claim against it as a professional medical negligence claim. (Dkt. 80 at 13.) Citing California Code of Civil Procedure Section 340.5, NaphCare claims that "Plaintiff is barred from bringing an action for professional negligence against a health care provider if it is beyond one year after the date of injury, or one year after the plaintiff discovers or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." (*Id.* [citing Cal. Civ. Proc. Code § 340.5].) But that is not what Section 340.5 says. Section 340.5 states that "[i]n an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." "A plaintiff in a medical malpractice action must satisfy the requirements of both the one-year and the three-year limitations periods." *Drexler v. Petersen*, 4 Cal. App. 5th 1181, 1189 (2016). Notably, "[t]he one-year limitations period . . . does not begin to run until the plaintiff discovers both his or her injury *and its negligent cause*." *Id.* (emphases added).

Doctors learned that Plaintiff's great left toe was again infected and needed be fully amputated sometime on or after June 21, 2021. (FAC ¶¶ 52–54; *see also* Dkt. 80 ["The FAC was filed more than two years from the date of the first alleged 'denial of care' in May/June 2021, which was the 'injury' as used in C.C.P., § 340.5.") Plaintiff's First Amended Complaint, therefore, was filed well within three years after the date of

injury. And because Plaintiff did not learn, nor could he have reasonably learned, of at least part of the cause of his injury—NaphCare's failure to schedule the necessary medical appointments—until after he commenced this action in January 2023, he was still within the one-year period when he filed his First Amended Complaint in December 2023. *See* Dkt. 88 at 6 [explaining that, as an inmate proceeding *pro se*, Plaintiff was not aware of NaphCare's existence or function until December 2023].) Accordingly, Plaintiff's negligence claim against NaphCare is not time barred.[2]

### C. Reckless/Willful Misconduct

NaphCare asserts that "California law does not recognize a separate and distinct cause of action for willful misconduct." (Dkt. 80 at 14.) Plaintiff's FAC titled this cause of action "Reckless/Willful Misconduct." (FAC at 11.) Reckless misconduct is also known as willful misconduct. California recognizes a cause of action for reckless misconduct, so NaphCare's challenge on this ground must be denied. *See Gonzalez v. Gen. Elec.*, 2023 WL 4203379, at *5 (C.D. Cal. June 23, 2023) (explaining "reckless misconduct allegation is a separate and cognizable legal theory").

Next, NaphCare argues that Plaintiff failed to plead sufficient facts to support this cause of action. (Dkt. 80 at 15–17.) "Three essential elements must be present to raise a negligent act to the level of willful misconduct: (1) actual or constructive knowledge of

[2] Even if Plaintiff asserted his negligence claim against NaphCare outside of the statute of limitations, dismissal of Plaintiff's claims against NaphCare would still be inappropriate at this stage. Given the relationship between BOP and NaphCare, it is plausible that NaphCare should have at least been on constructive notice of this action in the applicable period sufficient to permit Plaintiff's First Amended Complaint to relate back to the date of his filing the original Complaint. *See* Fed. R. Civ. P. 15(c)(1)(C). Accordingly, the Court would grant Plaintiff the benefit of discovery related to NaphCare's notice. *See Schwartz v. Nugent*, 2023 WL 1420480, at *7 (D.N.J. Jan. 31, 2023) (allowing pro se benefit of discovery to determine whether newly added defendants, including NaphCare, had sufficient notice to permit amended complaint to relate back). Indeed, Plaintiff asserts that NaphCare was on notice when he filed his administrative remedy form with BOP on February 8, 2022. (Dkt 88 at 4.)

the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril." *New v. Consol. Rock Prod. Co.*, 171 Cal. App. 3d 681, 689–90 (1985); *see also Thomas v. Country Villa Serv. Corp.*, 2016 WL 4538426, at *6 (Cal. Ct. App. Aug. 31, 2016).

Plaintiff alleges that BOP contracts NaphCare to provide medical services to prisoners and is responsible for scheduling their outside medical appointments. (FAC ¶¶ 4, 73.) He alleges that doctors specifically instructed NaphCare to schedule various appointments, but despite Plaintiff's status as a diabetic with significant foot issues, NaphCare inexplicably failed to comply with the doctors' requests. (*Id.* ¶¶ 48–49, 52.) As a company in the business of providing medical services, NaphCare, at a minimum, had constructive knowledge that failing to schedule necessary medical appointments for someone such as Plaintiff was likely to have grave consequences—as it did. Despite that knowledge, Plaintiff alleges that NaphCare, on multiple occasions, failed to act. (*Id.*) Construing Plaintiff's allegations in the light most favorable to him, he plausibly alleges reckless misconduct. *See Sababin v. Superior Ct.*, 144 Cal. App. 4th 81, 90 (2006) (explaining in the elder abuse context that "when the evidence and inferences are liberally construed, we easily conclude that there is a triable issue as to whether Covina's employees acted with recklessness, oppression or malice. A trier of fact could find that when a care facility's employees ignore a care plan and fail to check the skin condition of a resident with Huntington's Chorea, such conduct shows deliberate disregard of the high degree of probability that she will suffer injury.").

**D. IIED**

NaphCare similarly argues that Plaintiff fails to allege sufficient facts to support his claim for IIED against NaphCare. (Dkt. 80 at 18–19.) "The elements of an IIED

cause of action are (1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering, and (4) actual and proximate causation of the emotional distress." *Corona v. Quad Graphics Printing Corp.*, 218 F. Supp. 3d 1068, 1074 (C.D. Cal. 2016) (internal quotation marks and citation omitted). "Conduct is extreme and outrageous when it exceeds all bounds of decency usually tolerated by a decent society, and is of a nature which is especially calculated to cause, and does cause, mental distress." *Id.* (cleaned up). "Whether conduct is 'outrageous' is usually a question of fact. The standard for judging outrageous conduct does not provide a bright line rigidly separating that which is actionable from that which is not. Indeed, its generality hazards a case-by-case appraisal of conduct filtered through the prism of the appraiser's values, sensitivity threshold, and standards of civility. The process evoked by the test appears to be more intuitive than analytical." *Berry v. Frazier*, 90 Cal. App. 5th 1258, 1274 (2023), *as modified on denial of reh'g* (May 15, 2023) (cleaned up).

According to Plaintiff, NaphCare disregarded multiple requests from doctors to schedule critical medical care. (FAC ¶¶ 48–49, 52.) One of these appointments was for physical therapy so that Plaintiff could adjust to walking post amputation. (*Id.* ¶ 48.) This never occurred, and Plaintiff was in severe pain as he attempted to walk while he was recovering. Another was for a follow-up appointment to check for clearance of Plaintiff's bone infection. (*Id.* ¶ 47.) This too never occurred, and Plaintiff was forced to endure considerable pain without medication and clean wound dressings—ultimately culminating with a second amputation procedure that left Plaintiff hospitalized for six weeks. (*Id.* ¶¶ 49–52, 55.) Drawing inferences in favor of Plaintiff, it is plausible that NaphCare was aware of Plaintiff's perilous condition as a diabetic with a bone infection recovering from surgery and recklessly disregarded the high probability of Plaintiff experiencing severe mental distress from enduring this "saga of pain and suffering." (*See id.* ¶ 46.) Plaintiff also clearly alleges his severe emotional distress as he was reduced to

begging for help while suffering from a graphic injury, subjected to "treatment [that] was not even on par with that of a dog," "harmed physically and mentally," and "has been crippled and is forced to endure life-ling misery of disability and pain." (*See id.* ¶¶ 58, 65; *see also id.* ¶ 62 ["Without responsible management of his care, [Plaintiff] wallows in pain and suffers."].)

Construing Plaintiff's allegations in the light most favorable to him, he plausibly alleges IIED. *See Trujillo v. Cnty. of Los Angeles*, 2019 WL 6622853, at *12 (C.D. Cal. Jan. 22, 2019) ("If a jury finds that Mahoney had purposefully delayed or refused medical care, that would be outrageous. Therefore, the Court finds that there remain genuine issues of material fact as to whether Mahoney's actions were outrageous and **DENIES** Defendant Mahoney summary judgment as to the IIED claim."); *Richards v. Essick*, 2023 WL 122397, at *3 (N.D. Cal. Jan. 6, 2023) (denying motion to dismiss and explaining "[e]specially when liberally construed, the allegations underlying the IIED claim plausibly establish that County jail staff knew of a need for immediate medical care, they failed to summon that care, and the plaintiff suffered an injury proximately caused by that failure"); *Griffin v. Mortier*, 837 F. App'x 166, 173 (4th Cir. 2020) ("Indeed, a medical professional's placement of a person who had a seizure and suffered a head injury in a holding cell without examination or treatment can support a claim that the medical professional acted with reckless indifference to the possibility that the person may suffer further severe physical and emotional injury."); *Awalt v. Marketti*, 74 F. Supp. 3d 909, 942 (N.D. Ill. 2014) ("A reasonable juror could find that ignoring a patently severe medical condition is extreme and outrageous conduct, especially because the defendants had complete authority over the plaintiff because he was incarcerated.") (simplified); *Piercy v. Warkins*, 2017 WL 1477959, at *22 (N.D. Ill. Apr. 25, 2017) (allowing IIED claim to proceed when prisoner alleged that a prison nurse failed to adequately treat his medical condition).

## V. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is **DENIED.**[3]

DATED: May 22, 2024

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

[3] The Court has previously denied Plaintiff's requests for the appointment of counsel because of his demonstrated ability to litigate this case. (*See generally* Dkts. 10, 39.) However, as this case advances and the legal issues involving discovery or future dispositive motions become more complex, Plaintiff may renew his request for appointment of counsel. *See Agyeman v. Corr. Corp. of Am.*, 390 F.3d 1101, 1104 (9th Cir. 2004) (vacating judgment for failure to appoint counsel to incarcerated individual in light of case's complexity).